I don't want to mispronounce your name. Thank you, your honor. My name is David Bienvenu. We're ready to proceed. Thank you, your honor. May it please the court. My name is David Bienvenu and I represent Ethel Corporation, the trial defendant appellant and cross appellee in this case. Our briefing in this case goes into great detail about the legal errors that we contend resulted in a multi-million dollar verdict by the jury and a million dollar ultimate judgment against my client, Ethel Corporation. We briefed the legal error regarding the applicant, the judge allowing strict liability as an issue to go to the jury on the jury verdict form. We've raised what we contend is a reversible error made by the trial court allowing inherently speculative testimony from the plaintiff's industrial hygiene expert, Susan Ratterman, who essentially manufactured an exposure opinion applied to my client's facility literally out of thin air with no facts or underlying data and we've raised the issue of whether or not the foreseeability standard of Louisiana law is properly applied to the negligence claim in this case and I'm certainly pleased and would be pleased to address any unanswered questions that the court has regarding the errors that we briefed. The federal judicial system no doubt grants juries extensive significant deference to decide facts but this particular jury verdict was tainted by significant legal errors that permitted the verdict essentially to be rendered on the basis of sympathy, speculation, and bias and what I think explains the jury verdict in this case more than anything is the fact that the jury in this case was required to determine facts that occurred 60 years ago between a time period of 1955 and 1960 when James Gaddy worked as a process engineer at Ethel Corporation. Such an inquiry by its own nature is inherently speculative but the fact that this case might have occurred based on facts a long time ago doesn't relax the standards that are applicable to the admissibility of evidence and the standards that prevent speculation from finding its way into the into the verdict. On the issue of sympathy we know this jury was driven by sympathy. The jury awarded seven and a half million dollars in damages after deliberating for approximately two and a half hours there were 5,000 exhibits it was impossible for the jury to have examined the evidentiary record and we know it was based upon sympathy because Judge Fallon reduced the damage award from seven and a half million dollars to three million dollars on remittiture which is a recognition by the trial judge in this case that at least the damages that were awarded by the jury was not based upon the credible and admissible evidence in the case and so we know sympathy found its way into the system. We also know and I think the record shows that there was inadmissible speculation that found its way into the fact-finding process and this speculation occurred when the judge allowed Ms. Ratterman to testify over objection about an exposure scenario that was untethered to any evidence. James Gatti was an engineer who worked at Ethel Corporation between 1955 and 1960. Before he ever set foot on Ethel he had sustained substantial asbestos exposure at another facility in north Louisiana a paper mill where he was doing hands-on work tearing out and removing thermal insulation which every expert agreed substantially increased his risk of mesothelioma and alone could explain and should explain why he ended up getting this disease. Dr. Gatti then goes to Ethel but he was working in office buildings he testified that occasionally he would go to an area known as the sodium cell room where he speculated but could not recall that he might have been exposed to thermal insulation in those sodium cell rooms when at the request of the plaintiff completely rebutted the plausibility of Mr. Gatti ever being exposed in a sodium cell room. We then go to the third witness in this case Susan Ratterman who was plaintiff's industrial hygiene expert who then testifies that the sodiums that Dr. Gatti was somehow exposed because asbestos fibers were floating from an area known as the brick shed where sodium cells were being refurbished with spray-on insulation and that these fibers then floated into the air and were pulled in by the ventilation systems in the sodium cell room that then created asbestos exposure and so what Ms. Ratterman did in this case was recognizing that Dr. Gatti's exposure theories were not defensible. She then came up in the middle of trial with this alternate theory as to how he might have been exposed to asbestos and as we pointed out in our brief none of Ms. Ratterman's opinions in this case were testable because she had no calculations, she had no data, she didn't know anything about the variables which would be necessary to show fiber grip from a remote area to the area where Mr. Gatti was it wasn't generally accepted and the problem here is that neither the plaintiffs nor Judge Fallon ever indicated how Ms. Ratterman's testimony satisfied the Daubert standard over the objection of the defendant. All Ms. Ratterman provided to the court in this case was a general reference that she had seen some air sampling from people who were spraying lymphate or spraying on insulation onto various pieces of mechanical equipment and that those created some occupational exposures but that's not what Mr. Gatti ever did in this case. Mr. Gatti never refurbished sodium where sodium cells were operating which created no exposure to asbestos whatsoever because the sodium cells aren't being disturbed and he took measurements occasionally and we went from that testimony from Mr. Gatti to Dr. Ratt, Ms. Ratterman coming up with this completely manufactured theory about how somehow Dr. Gatti could have been exposed based upon this remote work if you assume that these fibers somehow travel into the ventilation system. The problem with expert speculation from a practical standpoint in the trial court is if speculation finds its way into a trial the burden of proof is effectively shifted in the minds of the jurors to the defendant to affirmatively disprove or falsify a negative. The defendant is never required to prove a negative in order to avoid liability and speculation without the testability required by Daubert denies a defendant like my client with even the falsify the speculation and so the result that ended up in this case was that the burden on Ethel was shifted to prove an impossibility. No defendant can ever meet that burden which is why speculation is inadmissible generally and it should have been held inadmissible in this particular case and so unless the court has questions about Mr. Ratterman's testimony which we fully agree I'm going to move to the issue of strict liability which is a legal issue. One of the reasons why the jury found my client liable was because the jury was instructed and given the ability to impose strict liability under Louisiana law as to the premises of my client. My client moved for judgment as a matter of law as required and this is an issue that should have never gone to the jury because strict liability is simply not applicable in this case. Strict liability arises under Louisiana law against the premises owner when there is an injury caused by a condition of the land, a condition, an unreasonably dangerous condition of the land or an unreasonably dangerous condition which is permanently attached to the land. The similar case on this issue was Loescher versus Parr which created strict liability in Louisiana. The condition in Loescher was a tree that had rotted which was permanently attached to the land. The rotten tree, the rot in the tree was a permanent condition and the rotten tree then fell and caused personal injury and the Louisiana Supreme Court found strict liability in that case. Strict liability never as a matter of law applies when the dangerous condition arises from work being performed on the land. In my brief I demonstrated for example that if a pool is manufactured or is built at three feet and somebody breaks their neck diving into the pool that is a permanent condition of that pool that creates danger. That is different than an injury that arises if a pool cleaner somehow is exposed to some chemical in the course of cleaning the pool even if that work is being directed by the pool owner. That is a hazard of work. That is not a hazard of the land itself and strict liability is inapplicable. In our brief and I asked the court to look very carefully at the decision that was written by Judge Barbier, another district court judge in Louisiana in Smith versus Union Carbide where Judge Barbier specifically held that on summary judgment that the risk of insulating activity of dealing with thermal insulation that might create asbestos dust in the air, asbestos dust in the air is not a condition or a defect in the property. It is a temporary condition and as a result while it may be actionable as negligence it's not actionable as a matter of strict liability. If Judge Barbier's decision had been followed and it is the correct application of Louisiana law to asbestos containing hazards, strict liability never should have gone on the jury verdict form in this case. Judgment as a matter of law should have been entered and the cases that we cite are very clear that the conditions created by maintenance or construction or construction debris or airborne issues, those are all temporary conditions that do not warrant or allow the application of strict liability. That is a de novo issue of law. Judge Fallon's denial of JMOL should be reversed and the jury never should have gotten to that issue. We then raise the issue of negligence and this is where I want to talk to the court a little bit about the concept known as hindsight bias. Dr. Gaddy was employed at my client's facility between 1955 and 1960 and what was known about the hazards of asbestos then is substantially different than what is known about the hazards today. But there was one critical failure of evidence that warrants a new trial and a vacating of the jury verdict in this case. The jury was required to measure negligence against two standards. One, was it foreseeable and two, did other companies do something about managing asbestos hazards that Ethel didn't do? In other words, the way to eliminate hindsight bias in a case like this isn't only to look at the issue of whether it's foreseeable but to see if other companies like suggest Ethel should have. And there wasn't a scintilla or a single bit of evidence suggesting that any company, any industry in the United States, any chemical manufacturer or refinery owner was somehow doing more than Ethel was doing in order to manage the hazards of asbestos. And for that simple reason alone, that is a critical failure where the court's own jury instruction wasn't followed by the jury in this case. Because foreseeability in real time can only be evaluated based upon what other similarly situated companies were doing in real time in the And so unless you show, unless the plaintiff shows that other companies evaluated the real time hazard in the 1950s the way the plaintiff suggests today, that is not a verdict that satisfies the standard of negligence that the instruction and the jury, that the jury was instructed to follow. Thank you Mr. Behan. We have your, you saved time for a vote. Mr. Clark. Good morning. Matthew Clark of Landry and Soir LLC, counsel for the Gatti family here. And Judge King, we extend our condolences to you. I am going to present an alternative view of the trial record that will disprove the key themes of Ethel's appeal. Theme one, only undisturbed asbestos at Ethel. Now Ethel's appeal to negligence and strict liability rulings depends on a trial record with no evidence of disturbed asbestos. Dr. Gatti told us, however, he disturbed asbestos in Ethel's pilot plant and that his co-workers did the same in proximity to him. Record at 8088 and 8090. Ethel employees stripped thick crucidolite insulation from 15 foot by 6 foot sodium cells where Dr. Gatti worked approximately twice per week. Record 8083, 8079 through 8081. Ethel employees tore out and replaced asbestos containing pipe insulation on a daily basis in the sodium plant. Record 8191. Dr. Gatti handled asbestos tape on a daily basis while an operator in the sodium cell houses for five week period. And then there was the continuous asbestos spray process at Ethel, dumping burlap sacks of asbestos fibers into air gun hoppers, spraying countless crucidolite asbestos fibers in open air, all just 20 feet from Dr. Gatti's workspace that was actively sucking in outside air through the five foot tall gaps running the length of every wall of every cell house. Record 8179. Theme two, no medical causation testimony needed from Ethel. Now this is an implied theme, but it's integral to Ethel's appeal. I cite your honors to CIRU versus Toro Infirmary, Louisiana Fourth Circuit, 105 Southern 3rd, 1068 at page 1091. A quote, expert medical testimony is required when the conclusion regarding medical causation is one that is not within the common knowledge, end quote. We don't have expert medical testimony from Ethel regarding causation of Dr. Gatti's mesothelioma. When we study Ethel's appeal, we see no reference to Dr. Creighton. We have unrebutted medical causation testimony against Ethel supporting Judge Fallon's rulings and the jury's findings. A specific causation attribution of Dr. Gatti's meso to Ethel. Now I don't know how Ethel's appeal survives that. It would not be by representing on rebuttal that Dr. Creighton relied on Ms. Ratterman for his opinion. He didn't. Dr. Creighton relied on Ms. Ratterman only for the type of asbestos fiber in Ethel's asbestos spray at the relevant time. But even that wouldn't matter because Ethel's own expert industrial hygienist, Dr. Rock, conceded that the fiber type was cricidolite, record at 8750. Dr. Creighton and Ethel's ability to cause mesothelioma of any asbestos type, Dr. Creighton told us 20 to 200 times more potent than other asbestos fiber types, record 8402, 8424. There is no evidence of cricidolite asbestos anywhere in Dr. Gatti's life but at Ethel. Theme three, foreseeability was an impossibility for Ethel. Now Judge Fallon called Ethel's foreseeability argument not dispositive. He said, the fact that Ethel did not recognize the risk of mesothelioma specifically is not dispositive here because a jury could reasonably find that Ethel was on notice that its practices did indeed create a serious risk of future physical injury for its employees. Judge Fallon is not alone on this. He has the Louisiana jurisprudence behind him. Roberts versus OCF, Louisiana First Circuit case, 878 Southern 2nd, 631. Holding, quote, even if Exxon did not know of the exact hazard of mesothelioma, it knew that exposure to asbestos containing products could cause serious lung disease and cancer. The Roberts court also rejected the proposition that before an employer can be held liable in negligence, it needed knowledge of the specific risk of mesothelioma. That's Ethel's argument to you. It's tried and it's untrue. Then we have Chazon versus Avondale, 947 Southern 2nd, 171, Louisiana Fourth Circuit, admonishing the trial defendant for, quote, splitting legal hairs when it argued similarly to Ethel that no study specific to the plaintiff's job description was available at the time of the plaintiff's work. And so all this talk about Dr. Gatti being exclusively an engineer or having a desk job, that's not in accord with Louisiana law. It's also not in accord with the trial evidence. Now, there's good reason why you'll study Ethel's foreseeability arguments and find no citation to Louisiana case going its way. They just don't exist. Theme four, air sampling is irrelevant. Ethel's appeal trivializes its failure to air sample in Dr. Gatti's workspaces. But Ethel's expert, Dr. Rock, bases defense of Ethel on the standards of the day. He said the employer learns whether it's in compliance with the standards of the day by air sampling. Did Ethel have access to the instruments for air sampling? Dr. Rock told the practice is to take information about the workplace risks and use it to reduce the risks. Record 8747, 8748, 8749. Now, when Ethel said air sampling in the 1950s was incapable of determining asbestos content in the air, Ms. Ratterman educated the jury. She said the permissible limit of the day was based on total dust reading. Record 8326. And so the fact remains relevant. Ethel did not air sample, could have, should have, didn't. Now, Ethel's corporate representative said it best in response to Ms. Bienvenu. Question, Mr. Clark said that Ethel stuck its head in the sand with respect to asbestos and safety of its employees. Based on your experience, is that true? Answer, not from 1971 on. No, sir. Record 8245. Now, earlier I told the court, I'm here with your alternative view of the evidence because where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. That's the United States Supreme Court talking to us in 564. The fact finder and Judge Fallon chose plaintiff's view. There is no cause to disturb negligence or strict liability rulings. Move on quickly to Ms. Ratterman. Judge Fallon qualified Ms. Ratterman as an expert in the field of industrial hygiene. She's a certified industrial hygienist, has been for decades, masters of science in environmental health, worked for the Department of Labor, OSHA, which is responsible for worker safety and health and asbestos safety. The standard of review here, abuse of discretion. Now, Ethel appealed because the jury heard how crecidilite asbestos fibers entered the sodium cell houses from air guns in the nearby brick shed. But really, the appeal misses the point because Judge Fallon found Ms. Ratterman's fiber drift theory unnecessary to the jury's conclusion. He said the jury was presented with ample testimony discussing other ways in which Dr. Gatti was exposed to asbestos at Ethel. Nevertheless, Ms. Ratterman's testimony about Ethel's continuous asbestos spray process was based on her study of scientific literature describing the spread of asbestos fibers from the nozzle of air guns. She looked at studies of airborne fiber concentrations at 20, 30, and 75 feet from the nozzle of the gun. She looked at fiber concentrations from the act of stripping old insulation that had been sprayed on the surfaces. She disclosed these sources of information and her opinions to Ethel via her expert report. The Sawyer study, for example, record 8303. Ethel deposed her before trial. Ethel didn't file a pretrial motion about Ms. Ratterman. It's still relying on Ms. Ratterman for its case against Owens, Illinois. Incidentally, Dr. Rock didn't do the air modeling that Ethel suggests Ms. Ratterman had to. And you know what? That's okay because Louisiana law does not require it. Louisiana does not require a quantitative level of exposure evidence in asbestos cases. That's the Louisiana Supreme Court, not just Matt Clark speaking. Rando versus Annco insulation, 16 Southern 3rd, 1065. Strict liability. A Louisiana strict liability claim has three elements. Now, I'll limit my presentation to the focus of Ethel's appeal, the temporary condition argument. Ethel says a, quote, permanent defect must be found before strict liability can attach to a problem. Crane didn't, and no Louisiana court has used the word permanent. Crane said, quote, a flaw or condition of relative permanence, 613 Southern 2nd, 2014 at page 219. A condition of relative permanence includes conditions that are less than permanent. What did Judge Fallon find? Not a temporary condition, but rather a defective standard operating procedure at the facility that resulted in strict liability. He continued, the asbestos dust created by the continuous refurbishment of sodium cells was not a temporary condition activity because as Dr. Gatti and Mr. Ponte, who spoke as Ethel testified, it happened all the time. It was part and parcel of the Baton Rouge facility's operation. Without constant cycle of refurbishment, the sodium cell plant would cease to operate. That's Dr. That's Judge Fallon's words, and it's based on the trial record. And so when Mr. Bienvenu references this court to low should be par and suggests that strict liability can attach to nothing but land, well, it's just out of line with Louisiana law. Frankly, Article 2317, which is the operative article, says the owner or custodian of a thing is answerable for damage occasioned by its ruin. And the thing in this case is the asbestos dust. The thing in this case is the continuous process. This is not the Smith case. This is not the case that Judge Barbier ruled on. However, Barbier, Judge Barbier did rightly refer to the Watts case. 135 Southern Third 53. That's a Louisiana appellate First Circuit opinion, which talks about a fact pattern very similar to our fact pattern. The Watts court saw a continuous process. And that continuous process led to strict liability. Now, at the last, this court to disregard Watts, even though Judge Barbier referenced it. Ethel says the Watts case is just too different. Why? Because the premise of the owner, the premises owner settled in advance of trial. Now, in light of Ethel's arguments for the liability of settled party Owens, Illinois. Well, I'll just leave that for Mr. Bienvenu to address. And at the risk of stating the obvious, the care, custody and control was not disputed in Dr. Gaddy's trial, which further distances this case from the cases on which Mr. Bienvenu and his briefing rely on to argue that strict liability doesn't apply. Also, just struck me. If strict liability only applied to land, then why is Mr. Bienvenu citing cases that reference slip and fall on a nail left at a construction site? A nail isn't the land. The quantum. Dr. Gaddy received the death sentence in July 2018. It's dramatic, but it's true. His mesothelioma diagnosis. He was told, he told the jury, the primary reason he existed, a project he'd been working for years on was slipping through his fingers because of was a doctor of chemistry. He invented his own technology. He patented it and he wished he wanted to convert waste into cheap energy abroad. He was in his middle eighties. That's true. But that doesn't make his experience with mesothelioma any less valuable. Not to me, not to his jury. Now, Dr. Creighton explained why Dr. Gaddy should have been expected to live another five to six years were it not for mesothelioma record at eight, four, three, three Dr. Fish, Dr. Gaddy's treating physician and Dr. Creighton agreed. Dr. Gaddy's precipitous decline in health and his death were caused by mesothelioma record eight, four, seven, three. Dr. Gaddy was depressed, incontinent, humiliated, lethargic, dramatically slowed, left with mesothelioma. Dr. Creighton told the jury and even Dr. Briel, Ethel's expert conceded that means pain. Dr. Briel said the worst cancer in the world. Stage four means invasion of the chest wall. Dr. Gaddy did have an incredibly high pain threshold and an aversion to pain medicine. His son told the jury that Dr. Gaddy underwent severely painful surgeries for mesothelioma in the end, Dr. Gaddy fed through a tube. He stopped speaking. Fluid from his mouth drained into his lungs, choking him to death. Now, I hope none of us know the torment of such an end, not at any age. What a difficult job to value that, that pain, suffering, mental anguish, loss of enjoyment of life. Those are all discrete categories of damages that the jury assigned to this case. And so this court has said, quote, the determination of the extent of damages is for the trier of fact, and in this area, the appellate court should step lightly or not at all, Henry Air Crash. This court uses the maximum recovery rule to determine whether an award is excessive. And so did Judge Fallon, but only to an extent. The maximum recovery rule calls for the application of a multiplier. For jury awards, that means 150% of past similar awards. The award is not reduced. I'm relying on Moore v. Angela, 353, Federal Third, 376. So for jury awards, this court has applied a multiplier of 50%. Judge Fallon found the case of White v. Energy factually similar. That finding gets the abuse of discretion standard. The white court upheld the general damages award of 3.8 million for a mesothelioma patient. Judge Fallon did not reduce Dr. Gatti's award to 150% of 3.8 million, which the multiplier and this court's precedent said he should have. Judge Fallon didn't apply the multiplier. If he had, the jury $7.5 million award couldn't have been remitted below 150% of 3.8 million or $5.7 million. Now I've seen no instance in which this court has accepted a jury award from the multiplier because in the words of the Fifth Circuit, the multiplier prevents the court from at 297. My hope is that this court can bring the remitted award into compliance with Fifth Circuit president by applying the multiplier. Finally, Owens, Illinois, and I'll wrap this up as quickly as I can. The question is, can a reasonable juror reach an Owens, Illinois liability finding on the trial record? No. Dr. Rock didn't think so. And I'll tell you, Mr. Bienvenu said that every expert agreed in the case against international paper. Well, that's factually inaccurate. Dr. Rock didn't think so. He didn't help make the case against international paper, and he didn't help Ethel make a case against Owens, Illinois. That's a fact. Dr. Gatti didn't give us product ID. He couldn't. He didn't mention Kalo. He couldn't. If Dr. Gatti had identified Kalo, this appeal would not exist. But Ethel's case about Kalo began and ended with Owens, Corning. Owens, Illinois used the company called Owens Corning to distribute its Kalo record at 8920 colon 17 through 21. That's how the jury got to their liability finding against Owens, Illinois. That is Ethel's trial attorney in closing, saying something he thought, and rightly so, a reasonable juror needed to hear before she could find Owens, Illinois liability. And in opposition to this appeal, Ethel gave the court even more information about Owens, Corning that isn't in the trial record. Trial was the time to introduce that information, and it all, all of it, all the information belies Ethel's opposition to the appeal. If this court denies the appeal, proof of liability relaxes in the Fifth Circuit. It's reasonable without two links in the evidence chain. We don't know. Owens, Corning did not manufacture Kalo. Not proven. Owens, Corning supplied Owens, Illinois Kalo. Not proven. And so I will end where I began. Can a reasonable juror reach an Owens, Illinois liability finding on the facts Ethel presented at trial? No. The jury was given an improper closing argument. Ethel knows it, and so it countered the appeal by calling the Owens, Illinois finding a credit. A credit may lead one to think Ethel had entitlement to liability. Reduction, pretrial settlement yields the entitlement. If Ethel doesn't get its credit, there's fraud, no fairness. That's the pitch. It's clever, but it's not Louisiana law. I refer this court to Danks 177 Southern 2nd 412. That's Louisiana Fourth Circuit. It describes what a credit is in the context of a settlement. It's a settlement during trial. Thank you, your honors. Thank you, counsel. Rebuttal? Yes, your honor. I'm going to first deal with Mr. Clark's argument regarding the settlement credits. What Mr. Clark wants to do is he wants to double recover. He wants to keep the money from international paper in Owens, Illinois, and then argue that Ethel doesn't get a settlement credit, even though the evidence of trial clearly showed the fault and legal responsibility of IP in Owens, Illinois. Judge Fallon, in his ruling, denying the JMOL, showed or identified that multiple witnesses, Susan Ratterman and Dr. Creighton, testified that K-Lo pipe was manufactured by a company called Owens, Illinois. Ms. Ratterman testified that the invoices showed that international paper received shipments of K-Lo pipe, and she had no evidence that international paper received any other type of pipe covering during the time period when Mr. Gaddy was working in international paper. Dr. Gaddy at international paper worked as a laborer and testified that he specifically, hands-on, removed thermal insulation, including tear-out, which Ms. Ratterman testified creates the highest occupational exposures associated with asbestos exposure in insulation in exhibit 340, which was introduced by Ethel, proved that point based upon peer-reviewed scientific literature. And so there was overwhelming evidence, not just the argument in closing, that supported the jury's allocation of fault as to Owens, Illinois and to international paper. But when we're talking about Ethel, and I have to just simply point out the error in what Mr. Gaddy is saying, Dr. Gaddy testified at record 8116, you never personally refurbished a sodium cell. Answer, no. You never personally removed insulation or insulated a sodium cell. Answer, no. Page 8086, when you were working at Ethel in the sodium plant, do you recall ever being Answer, I can't point to a specific instance I was standing adjacent to a cell being rebuilt. Mr. Ponty then testified it was impossible physically for sodium cells to be rebuilt in the sodium cell room because of electrical hazards and because of space. And Ms. Ratterman testified she had zero basis to disagree with Mr. Ponty's assessment as to the implausibility of this activity occurring. That's when Ms. Ratterman then came up with this fiber drift theory, which wasn't supported by anything. It wasn't even supported by Mr. Gaddy's own testimony, who did not even know what spray-on insulation was. Mr. Clark is confusing causation from fault in this case, because what Mr. Clark argued in closing is that this fiber drift, where fibers were supposedly allowed to move from the brick shed to the sodium cell area, it wasn't just a cause of mesothelioma. He argued to the jury that was where Ethel violated its standard of care. He argued it on the issue of liability. And so we not only have speculation being a basis for causation in the case, we have unsupported speculation, contrary to Daubert standards, being the basis for the finding of liability. And that's where the gate opened, and that's where we are asking this court to close the gate, order a new trial, and let's do this according to something other than speculation. I thank the court for its time. Thank you, counsel. That will conclude today's arguments. The court will reconvene tomorrow morning at 9 a.m. Thank you.